Filed 6/21/22  Williams v. Wells Fargo Bank CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| WILBUR WILLIAMS, JR. et al., | B314887 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. 20STCV15993) |
| WELLS FARGO BANK, N.A. et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed in part, reversed in part and remanded with directions.

Nick A. Alden for Plaintiffs and Appellants.

Severson & Werson, Jan T. Chilton and Elizabeth C. Farrell for Defendants and Respondents.

_____

Wilbur Williams, Jr., M.D., and his professional corporation, Wilbur Williams, M.D., Inc. (the Corporation; collectively, the Williams plaintiffs), appeal from an order of dismissal entered as to defendants Wells Fargo Bank, N.A., and its Glendale bank branch manager Hovanes Tonoyan (collectively, the Wells Fargo defendants) after the trial court sustained without leave to amend the Wells Fargo defendants' demurrer to the second amended complaint. The Williams plaintiffs asserted seven causes of action based on allegations the Wells Fargo defendants abetted Williams's former business partner Sevana Petrosian and her associates Salina Ranjbar, Vana Mehrabian, and Staforde Palmer (collectively, the Petrosian defendants) in embezzling approximately $11.5 million from the Corporation's bank accounts by allowing the Petrosian defendants to make large cash withdrawals, write checks to themselves, and transfer funds to their own accounts.

In sustaining the demurrers, the trial court found the Wells Fargo defendants did not have a duty to monitor withdrawals made by the Petrosian defendants because, as alleged, the Petrosian defendants were authorized signatories on the Corporation's accounts. On appeal, the Williams plaintiffs contend, among other arguments, the trial court erred because the second amended complaint alleges the Petrosian defendants' authority was limited to writing checks to pay the Corporation's bills, and Williams did not authorize other types of checks, wire transfers, and cash withdrawals from the Corporation's account.

We agree the Petrosian defendants' alleged cash withdrawals (about $700,000 within three months) were not made in an authorized manner, and the trial court erred in sustaining the demurrer as to the causes of action for conspiracy

2

to embezzle funds and violation of the Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.; UCL). Further, the Williams plaintiffs should be allowed to file a motion for leave to amend their causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. However, we affirm the order sustaining the demurrer as to the remaining causes of action in the second amended complaint and the order sustaining the demurrer to the cause of action for breach of fiduciary duty in the first amended complaint. We reverse the order of dismissal and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Second Amended Complaint*

The Williams plaintiffs filed this action on April 27, 2020. After the trial court sustained the Wells Fargo defendants' demurrer to the first amended complaint with leave to amend, the Williams plaintiffs filed the operative second amended complaint,[1] alleging causes of action for (1) breach of contract,

---

[1]     The Williams plaintiffs request we take judicial notice of 12 documents filed in two related actions: *Wilbur Williams, Jr., M.D., et al. v. Sevana Petrosian, et al.* (Super. Ct. Los Angeles County, 2020, No. 20STCV14137) and *Wilbur Williams, Jr., M.D., et al. v. Carol Lucas, Esq., et al.* (Super. Ct. Los Angeles County, 2020, No. 21STCP03133). The exhibits include five witness declarations (exhibits A, B, C, J, K); the articles of incorporation of Petrosian's company Sev Laser Aesthetics, LLC (exhibit F); three management services agreements between Williams, Sev Laser Aesthetics, LLC, and Petrosian Esthetic Enterprises (exhibits D, G, H); a bank statement (exhibit I); the

(2) declaratory relief, (3) conspiracy to convert and embezzle funds,[2] (4) negligence, (5) breach of the covenant of good faith and fair dealing, (6) financial elder abuse, and (7) violation of the UCL.[3]  The second amended complaint omitted several material

---

Corporation's 1099-K forms (exhibit L); and a publication of the California Medical Board regarding the licensure of medical businesses (exhibit E).  The Williams plaintiffs contend these documents are properly noticed as official court and government records under Evidence Code section 452, subdivisions (c) and (d).  However, the exhibits are offered for the truth of the matters asserted therein, pertain to facts subject to reasonable dispute, and are not appropriate for consideration on demurrer.  We therefore deny the request for judicial notice.  (*New Livable California v. Association of Bay Area Governments* (2020) 59 Cal.App.5th 709, 716 [A "'court cannot by means of judicial notice convert a demurrer into an incomplete evidentiary hearing in which the demurring party can present documentary evidence and the opposing party is bound by what that evidence appears to show.'"]; *Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 145 ["'Courts may not take judicial notice of allegations in affidavits [and] declarations . . . in court records because such matters are reasonably subject to dispute and therefore require formal proof.'"].)

[2]      For simplicity we refer to the third cause of action as a cause of action for conspiracy to embezzle funds.

[3]      The first amended complaint also included a cause of action for breach of fiduciary duty.  On appeal, the Williams plaintiffs challenge the trial court's ruling sustaining with leave to amend the demurrer to that cause of action.

factual allegations from the first amended complaint; we consider these allegations under the sham pleading doctrine.[4]

The second amended complaint relies on the same allegations for all counts. Williams was an 84-year-old physician who operated a medical practice in California through the Corporation, which he wholly owned. As of April 12, 2014 the Corporation operated two medical clinics in Los Angeles County. Petrosian and Ranjbar acted as the managers of the clinics; they managed the clinics' finances; and they "were granted the right to sign checks to pay bills of the clinics." In 2017 and 2018 the Corporation added seven more clinics, and Mehrabian and Palmer acted as managers of some of those clinics. Mehrabian and Palmer likewise "were granted the right to sign checks to pay bills of the clinics."

In 2018 Williams opened nine commercial bank accounts (one for each clinic) in the Corporation's name at Wells Fargo's

---

[4] See *Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425 ("Under the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment. [Citation.] 'If a party files an amended complaint and attempts to avoid the defects of the original complaint by either omitting facts which made the previous complaint defective or by adding facts inconsistent with those of previous pleadings, the court may take judicial notice of prior pleadings and may disregard any inconsistent allegations.'"). In their opening brief, the Williams plaintiffs argue there were no material inconsistencies between the complaints, but they do not contend the trial court's consideration of the allegations in the first amended complaint under the sham pleading doctrine was error.

Glendale branch.  Branch manager Tonoyan required Williams to execute documents that Tonoyan represented were necessary to open the accounts, but Tonoyan did not explain what the documents were.  At a meeting in 2018, Williams told Tonoyan that Petrosian, Ranjbar, Mehrabian, and Palmer "will be working for him," and Williams requested they "be given the right to sign checks to pay the bills of [the Corporation]."  However, Williams specified each of the Petrosian defendants "should be allowed to sign checks to pay bills of [the Corporation] and nothing else."  Williams "did not authorize [Wells Fargo] to allow [the Petrosian defendants] to withdraw cash or transfer funds from [the Corporation] to their corporate account at [Wells Fargo]."

The Williams plaintiffs alleged on information and belief that Tonoyan entered into a conspiracy with the Petrosian defendants to embezzle all of the Corporation's profits, and during the period from January 2018 through March 2020, the Petrosian defendants embezzled approximately $11.5 million from the Corporation's accounts.  In furtherance of the conspiracy, the Wells Fargo defendants issued the Petrosian defendants blank checks and a rubber stamp with a facsimile of Williams's signature.  Williams did not authorize and was unaware of the stamp, and "to cover up these facts," Wells Fargo never sent a hard copy of the Corporation's bank statements to Williams.

Using Williams's facsimile signature, the Petrosian defendants withdrew approximately $614,000 from the Corporation's accounts in the first three months of 2020 by

6

issuing checks to their own accounts at Wells Fargo.[5]  Tonoyan, in his capacity as an officer of Wells Fargo, was responsible for authorizing these checks, some of which exceeded $100,000, and none of which was personally signed or used to pay bills.  During the same time period, the Petrosian defendants also withdrew about $700,000 in cash from the Corporation's accounts.  Copies of online bank statements attached to the complaint reflect 25 in-branch withdrawals by Mehrabian or Palmer made within a 71-day period in increments ranging from $5,000 to $115,000.  In many instances, Wells Fargo's computer "rejected the transaction and raised red flags," but Tonoyan, pursuant to his conspiracy with the Petrosian defendants, used his authority to override the computer to allow the withdrawals.  The Petrosian defendants also made approximately $853,000 in wire transfers to their accounts.  Altogether, the Petrosian defendants withdrew more than $2.2 million from the Corporation's accounts in early 2020 without Williams's knowledge or authorization.

B.      *The Wells Fargo Defendants' Demurrer and the Trial Court's Order*

On April 27, 2020 the Wells Fargo defendants demurred to all causes of action in the second amended complaint.  They argued the causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing failed because the Williams plaintiffs did not allege the terms of a contract; instead, the second amended complaint contained as an

---

[5]      The images of processed checks attached to the complaint reflect as payees three Sev Laser entities and Petrosian Esthetic Enterprises.

7

attachment a document described as a "signature card that serves as a contract between a bank and its depositor." The document is titled "Certification Regarding Beneficial Owners of Legal Entity Customers," and the Wells Fargo defendants asserted the document was not a signature card or contract, and the complaint did not otherwise allege a specific contractual relationship between the Corporation and Wells Fargo.

The Wells Fargo defendants also argued the causes of action based on allegations they processed checks bearing Williams's signature presented by the Petrosian defendants, as authorized signatories on the Corporation's accounts, were barred under Financial Code section 1451 (section 1451), which provides a bank may assume a withdrawal made by an authorized party in an authorized manner is itself authorized, even if the withdrawal facially benefits the authorized party. Thus, the cause of action for conspiracy to embezzle funds failed because the second amended complaint did not allege any wrongful conduct by the Wells Fargo defendants given that the Petrosian defendants were authorized signatories on the Corporation's accounts. And as to the cause of action for negligence, "It is not negligent for a bank to honor checks drawn by those who are authorized to sign those checks." Further, the economic loss doctrine barred the negligence claim because the second amended complaint alleged only economic harm.

The Williams plaintiffs' remaining causes of action for declaratory relief, financial elder abuse, and violations of the UCL also failed because there was no underlying tort or breach of contract. In addition, the second amended complaint failed to allege elder abuse because all the allegedly embezzled funds were taken from the Corporation's account, not from Williams.

8

After a hearing, on June 30, 2021 the trial court sustained the Wells Fargo defendants' demurrer without leave to amend.[6] In its tentative ruling, which the court adopted as its order, the court found the Williams plaintiffs omitted key facts from the second amended complaint that they had alleged in the first amended complaint, essentially admitting under the sham pleading doctrine "the Petrosian Defendants were managers of the clinics and that Williams specifically told Tonoyan this when authorizing them as signatories." The court found the earlier allegations were "fatal to Plaintiffs['] claims because Defendants could not have breached a duty to Plaintiffs by doing the very thing Plaintiffs authorized them to do."

The trial court concluded the Williams plaintiffs failed to state a cause of action as to any of their claims because "Plaintiffs have alleged that the Petrosian Defendants were authorized to sign checks on behalf of Plaintiffs[,] they were allowed to sign the name of Williams[,] and Plaintiffs are bound by the use of that signature under Commercial Code section 3402. In addition, . . . Defendants were allowed to assume that the checks were being drawn for the purpose authorized and Defendants were obligated to honor those checks."

---

[6] The trial court did not rule on the Wells Fargo defendants' concurrent motion to strike portions of the second amended complaint, finding it was mooted by the sustaining of the demurrer. The motion to strike is not included in the record on appeal, and the parties have not addressed it. To the extent the motion to strike pertains to the surviving causes of action, the trial court should address the motion on remand.

9

On June 30, 2021 the trial court entered an order of dismissal in favor of the Wells Fargo defendants.[7] The Williams plaintiffs timely appealed.

## DISCUSSION

A. *Standard of Review*

"'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.'" (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768; accord, *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) When evaluating the complaint, "we assume the truth of the allegations." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209; accord, *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230.) A dismissal entered after a demurrer has been sustained without leave to amend "will be affirmed if proper on any grounds stated

---

[7] The order of dismissal stated the dismissal of the Wells Fargo defendants was without prejudice. To constitute an appealable judgment under Code of Civil Procedure section 904.1, subdivision (a)(1), a dismissal must be "in the form of a written order signed by the court and filed in the action" (*id.*, § 581d) and constitute a "final determination of the rights of the parties in an action or proceeding" (*id.*, § 577; see *Cook v. Stewart McKee & Co.* (1945) 68 Cal.App.2d 758, 763 [appellate court has no jurisdiction to review rulings on demurrers prior to a voluntary dismissal]). Here, the trial court signed the order of dismissal, and although the order stated the dismissal was without prejudice, the order was entered following the court's order sustaining the demurrer without leave to amend, thus finally determining the rights of the parties.

10

in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324; accord, *Ko v. Maxim Healthcare Services, Inc.* (2020) 58 Cal.App.5th 1144, 1150.)

B.  *The Trial Court Erred in Sustaining the Demurrer to the Causes of Action for Conspiracy To Embezzle and Violation of the UCL*

1.  *As alleged, the Wells Fargo defendants owed a duty to monitor cash withdrawals from the Corporation's accounts*

As the Wells Fargo defendants observe in their respondents' brief, "[a]t bottom, each of plaintiffs' claims rests on the notion that Wells Fargo should have policed [the Corporation's] accounts to assure that the Petrosian defendants did not abuse their power, as authorized co-signers on those accounts, to write checks or make withdrawals for unauthorized purposes." We agree the existence and scope of the Wells Fargo defendants' duty to monitor withdrawals from the Corporation's account is the central issue raised by the demurrer as to all causes of action. The Wells Fargo defendants contend that under section 1451, a bank's duty to act with reasonable care toward its depositors does not extend to the monitoring of withdrawals from bank accounts by authorized signatories in an authorized form or manner. As alleged, however, the Petrosian defendants' cash withdrawals were not in an authorized form or manner because Williams only authorized the Petrosian defendants to "sign

11

checks to pay bills," and "nothing else."[8]  Thus, the trial court erred in sustaining the demurrer based on the absence of a duty on the part of the Wells Fargo defendants.

"'The relationship between a bank and its depositor is founded on contract,' [citation] which is ordinarily memorialized by a signature card that the depositor signs upon opening the account." (*Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 537 (*Chazen*).)  "'It has long been regarded as "axiomatic that the relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor." [Citation.]  "A debt is not a trust and there is not a fiduciary relation between debtor and creditor as such."'" (*Ibid*.)  "Accordingly, banks 'are not fiduciaries for their depositors.'" (*Ibid*.; accord, *Kurtz-Ahlers, LLC v. Bank of America, NA.* (2020) 48 Cal.App.5th 952, 956 (*Kurtz-Ahlers*).)

"Nevertheless, '[i]t is well established that a bank has "a duty to act with reasonable care in its transactions with its depositors."'" (*Kurtz-Ahlers, supra*, 48 Cal.App.5th at p. 956, quoting *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 808.)  "The duty is an implied term in the contract between the bank and its depositor." (*Kurtz-Ahlers*, at p. 956; accord, *Chazen, supra*, 61 Cal.App.4th at p. 543.)  The scope of a bank's duties under a deposit agreement is narrow.  (*Kurtz-Ahlers*, at p. 956.)

---

[8]    Because we conclude the Williams plaintiffs adequately pleaded causes of action for conspiracy to embezzle and violation of the UCL based on the Wells Fargo defendants' processing of unauthorized cash withdrawals, we do not reach whether the alleged wire transfers and checks written to the Petrosian defendants' corporate accounts were in an authorized form or manner.

12

"Such duties include the duty to *honor* checks properly payable from the depositor's account." (*Ibid.*; accord, *Chazen*, at p. 539 ["Banks are strictly liable for the wrongful dishonor of checks."].). Conversely, banks have "the duty to *dishonor* checks lacking required signatures." (*Kurtz-Ahlers*, at p. 956.)

However, the contractual relationship between a bank and its depositor "does not involve any implied duty 'to supervise account activity' [citation] or 'to inquire into the purpose for which the funds are being used . . . .'" (*Chazen, supra*, 61 Cal.App.4th at p. 537; see *Kurtz-Ahlers, supra*, 48 Cal.App.5th at pp. 956-959 [bank owed depositor no duty to investigate suspicious checks cashed by bookkeeper who deceived the depositor into issuing tax payment checks that the bookkeeper deposited into her own account instead of mailing to tax authorities]; *Software Design & Application v. Hoefer & Arnett* (1996) 49 Cal.App.4th 472, 481 [there is no authority for the proposition "that, in the absence of suspicious instruments, a bank has a duty to supervise account activity or otherwise track frequent and/or large dollar transactions in deposit accounts"].)

Section 1451 addresses the longstanding principle first codified in the 1925 Bank Act (Stats. 1925, c. 312 (Assem. Bill No. 725 (46th Sess.) § 16a) that banks are not obligated to monitor withdrawals made by authorized parties in an authorized manner—even where the funds are paid to the withdrawing party. Section 1451 provides, "When the depositor of a commercial or savings account has authorized any person to make withdrawals from the account, the bank, in the absence of written notice otherwise, may assume that any check, receipt, or order of withdrawal drawn by such person *in the authorized form or manner*, including checks drawn to his personal order and

13

withdrawal orders payable to him personally, was drawn for a purpose authorized by the depositor and within the scope of the authority conferred upon such person."[9]  (Italics added.) Section 1451's limitation on the bank's duty to supervise withdrawals is designed to further the strong public policies to protect depositor privacy (see *Chicago Title Ins. Co. v. Superior Court* (1985) 174 Cal.App.3d 1142, 1159 [if "banks had a duty to reveal suspicions about their customers, they would violate their customers' right to privacy, not to mention be forced to act as the guarantor of checks written by the depositors"]); the need for an efficient processing of banking transactions (see *Kurtz-Ahlers*, 48 Cal.App.5th at p. 960-961 [limitation on bank's duty furthers rules requiring "'banking transactions to be processed quickly and automatically and impos[ing] strict deadlines for the payment or timely dishonor of checks '"]); and the recognition

---

[9]    Commercial Code section 3307, subdivision (b)(3), also relied on by the Wells Fargo defendants, similarly provides as to checks written by a fiduciary on a depositor's account, "If an instrument is issued by the represented person or the fiduciary as such, and made payable to the fiduciary personally, the taker does not have notice of the breach of fiduciary duty unless the taker knows of the breach of fiduciary duty."  The Wells Fargo defendants rely on this provision to argue Wells Fargo, as the "taker" of the checks to the Petrosian defendants, did not have notice of any breach of fiduciary duty by the Petrosian defendants.  However, the second amended complaint does not allege that the Petrosian defendants were fiduciaries of the Corporation, and thus this section would not apply.  The second amended complaint only alleges the Petrosian defendants "managed" the Corporation's clinics and finances, and Williams told Tonoyan the Petrosian defendants "will be working for him."

14

that depositors are better equipped than depository banks to identify fraudulent activity (*id*. at p. 961; see *Desert Bermuda Properties v. Union Bank* (1968) 265 Cal. App.2d 146, 151-152 ["when the Legislature adopted what is now Financial Code, section [1451], it relieved banks from any general duty to police fiduciary accounts (a duty which a bank could not reasonably be expected to carry out effectively)"].).

Contrary to the trial court's conclusion the Petrosian defendants were authorized "to withdraw funds and sign checks," the second amended complaint only alleged that Williams told Tonoyan when Williams opened the Corporation's accounts that the Petrosian defendants "should be allowed to sign checks to pay bills of [the Corporation] and nothing else," specifying Williams "did not authorize [Wells Fargo] to allow [the Petrosian defendants] to withdraw cash or transfer funds." Thus, under section 1451, the "authorized form or manner" of withdrawals from the Corporation's accounts only included the writing of checks, not cash withdrawals by the Petrosian defendants. Section 1451 may have relieved the bank of responsibility for the Petrosian's defendants check-writing practices (potentially subject to a limitation on checks to pay bills), but the statute did not absolve the Wells Fargo defendants of their duty to exercise reasonable care when Mehrabian and Palmer withdrew more than $700,000 in cash from the Corporation's accounts. (See *Kurtz-Ahlers, supra*, 48 Cal.App.5th at p. 956.)

Although we are unaware of any case authority distinguishing between types of withdrawals with respect to section 1451's limitation on a bank's duty of reasonable care, our reading of section 1451 is consistent with the statute's specific reference to a "check, receipt, or order of withdrawal" in limiting

15

authority to the "authorized form or manner." Had the Legislature intended to broadly immunize a bank from liability for any form of withdrawal regardless of the specified authority granted by the depositor to the signatory, as argued by the Wells Fargo defendants, the Legislature could have simply referred to withdrawals from an account, without specifying three types of withdrawals (a check, receipt, or order of withdrawal). (See *California Building Industry Assn. v. State Water Resources Control Board* (2018) 4 Cal.5th 1032, 1041 [in construing a statute, "'[w]e consider first the words of a statute, as the most reliable indicator of legislative intent'"]; *Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387 ["We must look to the statute's words and give them 'their usual and ordinary meaning.'"].)

The courts have imposed a duty of reasonable care on banks in similar contexts where there are limits on a signatory's authority with respect to a bank account. For example, in *Torrance Nat. Bank v. Enesco Federal Credit Union* (1955) 134 Cal.App.2d 316, 320-321 the Court of Appeal concluded former Financial Code section 953 (the predecessor to section 1451) did not assist a bank in its action against a corporate depositor to recover an overdraft on the corporation's bank account where the corporate officer who signed a check on the account was authorized to sign "'check[s] and drafts,'" but he was not authorized to sign a check that was greater than the account balance. The court concluded a check that caused the depositor's account to be overdrawn was not "'in the authorized form and manner'" under section 953 because it was in excess of the balance of the depositor's account with the bank, explaining, "The fact that any check for an amount less than or up to the

amount of the deposit would have been authorized does not alter the fact that the check involved in the instant action was unauthorized." (*Id.* at pp. 319, 328; see *Bullis v. Security Pac. Nat. Bank, supra*, 21 Cal.3d at pp. 811-812 [Financial Code section 953 did not immunize a bank from liability for failing to require the signatures of two coexecutors for withdrawal from an estate's checking account where the coexecutors both signed signature cards for the checking account, but the cards clarified that the accounts were governed by applicable banking laws and customs, and the bank's operations manual required both coexecutors to authorize a withdrawal].)[10]

---

[10] We recognize it would be unusual for a large bank like Wells Fargo to agree based on a branch manager's oral communications with a depositor that a signatory has narrowly prescribed authority to make withdrawals on an account (here, to sign checks to pay bills, and not to make cash withdrawals or wire transfers), but in reviewing a ruling on a demurrer, we accept the allegations as true. (*Brown v. USA Taekwondo, supra*, 11 Cal.5th at p. 209.) Further, we are unaware of any legal authority that would prevent a bank from allowing such a restriction. The attorney for the Wells Fargo defendants acknowledged at oral argument that a bank could in theory authorize an employee to agree to the restriction alleged here, although he observed that Wells Fargo, with hundreds of thousands of employees, would never allow an oral agreement for signatory authority, and written depository agreements would foreclose this possibility.

17

2. *The third cause of action adequately pleaded a cause of action for conspiracy to embezzle funds*

"Civil conspiracy is not an independent tort. [Citation.] 'Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort.'" (*Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 206; accord, *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 511.) "'[T]he basis of a civil conspiracy is the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act.' [Citations.] The conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1582; accord, *Favila*, at p. 206.) "Knowledge and intent "'may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances."'" (*Favila*, at p. 206.)

"'Embezzlement is the fraudulent appropriation of property by a person to whom it has been [e]ntrusted.' ([Pen. Code,] § 503.) The elements of embezzlement are '1. An owner entrusted his/her property to the defendant; 2. The owner did so because he/she trusted the defendant; 3. The defendant fraudulently converted that property for his/her own benefit; [and] 4. When the defendant converted the property, he/she intended to deprive the owner of its use.'" (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 636; accord, *People v. Selivanov* (2016) 5 Cal.App.5th 726, 764.)

The second amended complaint alleged Tonoyan entered into a conspiracy with the Petrosian defendants to embezzle

18

$11.5 million from the Corporation's accounts by providing the Petrosian defendants with blank checks and a facsimile signature stamp, approving large cash withdrawals that he knew to be unauthorized, and "us[ing] his authority to override the computer as to allow the transactions to go thru [sic]."[11]

The trial court agreed with the Wells Fargo defendants that the Williams plaintiffs failed to plead an underlying claim for embezzlement because the alleged withdrawals were authorized by Williams, and thus there was no fraudulent conversion. However, as discussed, at least as to the cash withdrawals, the transactions were not authorized.

The Wells Fargo defendants also contend the conspiracy claim fails because the Williams plaintiffs failed to allege Tonoyan was aware of and intended to assist in the Petrosian defendants' embezzlement from the Corporation's accounts. But the second amended complaint alleged Tonoyan knew Williams had authorized the Petrosian defendants only to write checks on the account, and he did not authorize cash withdrawals or transfers. Further, as alleged, Tonoyan assisted the Petrosian defendants by providing them blank checks and the signature stamp, failing to send paper statements to Williams "to cover up these facts," and overriding computerized red flags despite knowing enormous cash withdrawals were being taken from the Corporation accounts. From these factual allegations, it is reasonable to infer Tonoyan had actual knowledge of an embezzlement scheme and intended to and acted in concurrence

---

[11]     The second amended complaint alleged Wells Fargo is liable for the conspiracy under principles of respondeat superior.

19

with the tortious scheme.  (*Favila v. Katten Muchin Rosenman LLP, supra*, 188 Cal.App.4th at p. 206.)

> 3.  *The seventh cause of action adequately pleaded a cause of action for violation of the UCL based on the Wells Fargo defendants' alleged participation in the conspiracy to embezzle*

The UCL "prohibits unfair competition, including unlawful, unfair, and fraudulent business acts.  [The UCL] covers a wide range of conduct.  It embraces """"anything that can properly be called a business practice and that at the same time is forbidden by law."""  [Citations.]'  [Citation.] . . . [¶]  [The UCL] 'borrows' violations from other laws by making them independently actionable as unfair competitive practices."  (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143; accord, *Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 896.)  "[A] practice may violate the UCL even if it is not prohibited by another statute.  Unfair and fraudulent practices are alternate grounds for relief."  (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370; accord, *Medical Marijuana, Inc.*, at p. 896.)

The second amended complaint alleged the Wells Fargo defendants' conspiracy, conversion of the Corporation's funds, financial elder abuse, and breach of the covenant of good faith and fair dealing constituted the unfair business practices.  Where a UCL claim is entirely derivative of other claims, "the cause of action stands or falls" with those underlying claims.  (*Medical Marijuana, Inc. v. ProjectCBD.com, supra*, 46 Cal.App.5th at p. 896 ["Given that there is no further indication in the second amended complaint as to what conduct or statements on the part

20

of the [defendants], other than the statements identified in the pleaded cause of action for libel, plaintiffs rely on for their UCL cause of action, we agree that plaintiffs' UCL cause of action 'must . . . stand or fall with the underlying claims' for libel and false light."]; accord, *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 277 [where plaintiff's "UCL claim is derivative of [his] defamation cause of action, . . . that cause of action stands or falls with that underlying claim"].)

Because the trial court erred in sustaining the demurrer to the cause of action for conspiracy to embezzle, it likewise erred in sustaining the demurrer to the derivative UCL claim.

C.  *The Trial Court Properly Sustained Wells Fargo's Demurrers to the Causes of Action for Breach of Fiduciary Duty, Breach of Contract, Negligence, Breach of the Covenant of Good Faith and Fair Dealing, Financial Elder Abuse, and Declaratory Relief*

1.  *Breach of fiduciary duty (first amended complaint)*

On appeal, the Williams plaintiffs contend the trial court erred in sustaining without leave to amend the Wells Fargo defendants' demurrer to the breach of fiduciary cause of action included in the first amended complaint.  The trial court did not err.

"'"The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach.  [Citation.]  Whether a fiduciary duty exists is generally a question of law."'"
(*Hodges v. County of Placer* (2019) 41 Cal.App.5th 537, 546; accord, *Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 441.)  "A fiduciary relationship is '"any

21

relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party.'"'" (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29.) A fiduciary duty can exist in the absence of a fiduciary relationship defined by law if the fiduciary has voluntarily agreed to accept fiduciary responsibilities. (*Ibid*.) The Williams plaintiffs contend they sufficiently alleged a cause of action for breach of fiduciary duty because the first amended complaint alleged the parties agreed to enter a fiduciary relationship. It did not.

As discussed, "banks 'are not fiduciaries for their depositors.'" (*Chazen, supra*, 61 Cal.App.4th at p. 537; accord, *Copesky v. Superior Court* (1991) 229 Cal.App.3d 678, 693-694 [bank-depositor relationship is not a fiduciary relationship, "quasi-fiduciary relationship," or even a "special relationship"].) Although the first amended complaint cursorily alleged the parties' relationship was "at a minimum, quasi-fiduciary," it did not allege an agreement by the Wells Fargo defendants to assume any fiduciary responsibilities. The first amended complaint alleged Williams met with Tonoyan for the purpose of opening nine checking accounts; the Williams plaintiffs "totally depended on [Wells Fargo] . . . and depended on its honesty and expertise to protect them"; and the Wells Fargo defendants breached the trust and confidence Williams placed in them. Absent is any allegation Tonoyan or Wells Fargo agreed to assume a duty toward the Williams plaintiffs beyond the bank-depositor relationship.

2.     *First cause of action for breach of contract*

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or

22

excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; accord, *C.W. Howe Partners Inc. v. Mooradian* (2019) 43 Cal.App.5th 688, 699.) "A written contract may be pleaded either by its terms—set out verbatim in the complaint or a copy of the contract attached to the complaint and incorporated therein by reference—or by its legal effect. [Citation.] In order to plead a contract by its legal effect, plaintiff must 'allege the substance of its relevant terms. This is more difficult, for it requires a careful analysis of the instrument, comprehensiveness in statement, and avoidance of legal conclusions.'" (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1489; accord, *Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 993.)

The second amended complaint alleged Williams executed a "signature card that serves as a contract between a bank and its depositor," which purported contract is attached as an exhibit to the second amended complaint. Although the attached document bears Williams's signature, it is patently not a contract. The attached certification regarding beneficial owners of legal entity customers is instead a disclosure required under federal law, as described on its first page: "To help the government fight financial crimes, federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers." (See 31 C.F.R. § 1010.230(b)(1) & Appx. A [financial institutions are required to maintain procedures to identity the beneficial owner of any legal entity customer at the time an account is opened, which may be accomplished by obtaining a "certification regarding beneficial owners of legal entity customers" on a prescribed form].) The

23

second amended complaint does not plead the terms of any other contract to support the breach of contract cause of action.[12] Accordingly, the trial court properly sustained the demurrer to the breach of contract cause of action. (*Heritage Pacific Financial, LLC v. Monroy, supra,* (2013) 215 Cal.App.4th 972, 993 [court did not err in sustaining demurrer to cause of action for fraud on assignment where plaintiff failed to plead or attach a written agreement evincing an intent to assign claims].)

3. *Fourth cause of action for negligence*

"'The elements of a cause of action for negligence are: the "defendant had a duty to use due care, that he [or she] breached that duty, and that the breach was the proximate or legal cause of the resulting injury."'" (*Day v. Lupo Vine Street, L.P.* (2018) 22 Cal.App.5th 62, 69; accord, *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477.) As discussed, the Wells Fargo defendants argued in their demurrer that under section 1451 they had no duty of reasonable care toward the Williams plaintiffs to monitor withdrawals by the Petrosian defendants on the Corporation's bank accounts. Because section 1451 did not shield the Wells Fargo defendants from liability (at least as to cash withdrawals), and they owed a duty to the Williams plaintiffs as the depositor, the second amended complaint sufficiently alleged the elements

---

[12]     Although we read the second amended complaint to allege that Wells Fargo and the Williams plaintiffs had a depositor agreement under which the accounts were opened, the second amended complaint does not allege breach of a depositor agreement. As we discuss below, the Williams plaintiffs' attorney stated at oral argument that the contract claim is based instead on an oral agreement between Williams and Tonoyan.

of a cause of action for negligence.  Specifically, the second amended complaint alleged the Wells Fargo defendants processed in-person cash withdrawals of about $700,000 from the Corporation's accounts in early 2020 despite Tonoyan's knowledge Williams did not authorize the Petrosian defendants to make cash withdrawals.

However, as the trial court correctly found, the negligence cause of action was independently barred by the economic loss rule.  Under the economic loss rule, "there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage." (*Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 922 (*Sheen*); see *Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 18 ["Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone."].)  Where the parties are in contractual privity, "the rule functions to bar claims in negligence for pure economic losses in deference to a contract between litigating parties."  (*Sheen*, at p. 922; see *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 988 (*Robinson Helicopter*) ["The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.  [Citation.]  Quite simply, the economic loss rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.'"].)

Despite the rule's simple framing, "[n]ot all tort claims for monetary losses between contractual parties are barred by the economic loss rule.  But such claims are barred when they arise from—or are not independent of—the parties' underlying

25

contracts." (*Sheen, supra*, 12 Cal.5th at p. 923; see *Robinson Helicopter, supra*, 34 Cal.4th at p. 991 [where manufacturer alleged a parts supplier provided false certificates of conformance with manufacturing specifications, "the economic loss rule does not bar [the plaintiff's] fraud and intentional misrepresentation claims because they were independent of [the defendant's] breach of contract"].)

In *Sheen*, the plaintiff used his home as collateral for two loans from the bank. After he missed payments on the loan, he submitted applications to modify the loans, but the bank failed to respond. The plaintiff sued the bank for negligence, alleging the bank owed a duty of care to review and respond to plaintiff's loan application. (*Sheen, supra*, 12 Cal.5th at pp. 914-915.) The trial court sustained the bank's demurrer to the negligence claim finding no duty of the bank in tort to respond to plaintiff's request for a loan modification. (*Id.* at p. 919.) The Supreme Court affirmed, observing the plaintiff had an agreement with the bank that specified the parties' rights and obligations with respect to the loan, including that the bank could seize and sell the property if plaintiff stopped making payments on the loan. (*Id.* at p. 924.) The court held plaintiff's negligence claim was barred by the economic loss rule because it was not independent of the original contract, explaining, "To impose a tort duty in such circumstances would go further than creating obligations unnegotiated or agreed to by the parties; it would dictate terms that are contrary to the parties' allocation of rights and responsibilities. The proposed duty would impede [the bank's] right to foreclose by permitting foreclosure only after [the bank] discharges a tort duty to 'process, review and respond carefully

26

and completely to [a borrower's] loan modification application[s].'" (*Id.* at p. 925.)

As in *Sheen*, the Williams plaintiffs substantially allege—notwithstanding the pleading defects in the first cause of action for breach of contract—that Williams had an agreement with the Wells Fargo defendants that specified the parties' rights and obligations with respect to processing withdrawals from the Corporation's accounts. Wells Fargo allegedly breached that agreement by processing cash and other unauthorized withdrawals. The measure of contract damages alleged in the second amended complaint ($11.5 million) is the amount the Petrosian defendants allegedly embezzled from the Corporation between January 2018 and March 2020. The negligence cause of action is premised on the same factual allegations, the same alleged duty of Wells Fargo as to withdrawals, and the same measure of damages (the embezzled $11.5 million).[13] Under

---

[13] The negligence cause of action included a conclusory allegation that Williams "suffered and continues to suffer severe emotional distress, all to his damage in an amount in excess of the minimum jurisdictional limit of the above-referenced court." However, emotional distress damages are generally not recoverable for negligence where the plaintiff suffers only economic injury, other than in a cause of action for negligent infliction of emotional distress. (See *Erlich v. Menezes* (1999) 21 Cal.4th 543, 554-555 ["a preexisting contractual relationship, without more, will not support a recovery for mental suffering where the defendant's tortious conduct has resulted only in economic injury to the plaintiff"]; see also *Butler-Rupp v. Lourdeaux* (2005) 134 Cal.App.4th 1220, 1228 ["The *Erlich* holding is consistent with the economic loss rule reviewed in [*Robinson Helicopter*]."].) There are no material allegations

27

these circumstances, the economic loss rule properly functions "to bar claims in negligence for pure economic losses in deference to a contract between litigating parties." (*Sheen, supra*, 12 Cal.5th at p. 922.)

>    4.    *Fifth cause of action for breach of the covenant of good faith and fair dealing*

"The covenant of good faith and fair dealing is implied by law in every contract and exists to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement. [Citation.] The scope of the covenant depends upon the underlying contract: The covenant 'cannot "be endowed with an existence independent of its contractual underpinnings."'" (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2019) 42 Cal.App.5th 918, 940-941; accord, *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 349-350 [The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement"]; see *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 690 [ "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose."].) Accordingly, "'[t]he prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of

---

Williams suffered any harm other than the alleged $11.5 million in economic harm, and the Williams plaintiffs did not argue below nor do they contend on appeal that Williams "can demonstrate harm above and beyond a broken contractual promise." (*Robinson Helicopter, supra*, 34 Cal.4th at p. 988.)

a contractual relationship between the parties.'" (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 711.) Further, the implied covenant must rest upon the existence of a specific contractual obligation. (See *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031 [although parties had a contractual relationship, there was no express obligation to negotiate a modification that could give rise to a claim for bad faith with respect to the negotiations].)

The Williams plaintiffs alleged the conspiracy by the Wells Fargo defendants to embezzle funds from the Corporation's accounts breached their duty of good faith and fair dealing arising out of their contractual relationship. But, as discussed, the only alleged contractual relationship was based on the signature card, and the Williams plaintiffs failed to attach any other contract or allege the terms of a contract. Accordingly, the trial court properly sustained the demurrer to this cause of action.

5.     *Sixth cause of action for financial elder abuse*

Financial elder abuse occurs when a person "takes, secretes, appropriates, obtains or retains real or personal property of an elder," or assists in these activities, either "for a wrongful use or with intent to defraud, or both," or "by undue influence." (Welf. & Inst. Code, § 15610.30, subd. (a)(1).) An "elder" is "any person residing in this state, 65 years of age or older." (*Id.*, § 15610.27.)

The trial court correctly found the second amended complaint failed to allege a cause of action for financial elder abuse because it does not allege funds were taken from a person

29

over 65—all of the alleged withdrawals were taken from the Corporation's business checking accounts, not from Williams.[14] "It is fundamental that a corporation is a legal entity that is distinct from its shareholders." (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108; accord, *Presta v. Tepper* (2009) 179 Cal.App.4th 909, 914 [a corporation is a "distinct legal entity separate from its stockholder and from its officers"]; see *Hilliard v. Harbour* (2017) 12 Cal.App.5th 1006, 1015 [plaintiff did not have standing to sue for financial elder abuse because his claim did not "originate in circumstances independent of his status as a shareholder in the [c]ompanies, and his claim therefore cannot be deemed personal"].)

The Williams plaintiffs argue we should treat the alleged embezzlement from the Corporation as if the funds were taken from Williams personally because he operated the Corporation as his "alter ego," pointing to the allegations that Williams was the

---

[14] There are circumstances in which the taking of property not held directly by an elder may be actionable. (See Welf. & Inst. Code, § 15610.30, subd. (c) [financial elder abuse occurs "when an elder or dependent adult is deprived of any property right . . . , regardless of whether the property is held directly or by a representative of an elder or dependent adult."].) However, a "representative" is narrowly defined as "a person or entity that is either . . . : [¶] (1) [a] conservator, trustee, or other representative of the estate of an elder or dependent adult [or] [¶] (2) [a]n attorney-in-fact of an elder or dependent adult who acts within the authority of the power of attorney." (*Id.*, § 15610.30, subd. (d).) The Corporation does not fall within this definition of a representative.

100 percent owner of the Corporation and "any loss or profit generated by [the Corporation] is directly attributed to Williams." The Williams plaintiffs misapprehend the alter ego doctrine.

"""Under the alter ego doctrine, . . . where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation.""" (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1106; accord, *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1518.) "Thus, alter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form." (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 994; accord, *Butler America, LLC v. Aviation Assurance Co. LLC* (2020) 55 Cal.App.5th 136, 147.) As alleged, the Corporation maintained accounts for each of its nine medical clinics, and Williams authorized the Petrosian defendants to pay the clinic's expenses from the accounts. That Williams was the sole owner of the Corporation does not make the company his alter ego, let alone bring a corporation under the aegis of the elder abuse law.

6.      *Second cause of action for declaratory relief*
"'A complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy

31

relating to the legal rights and duties of the parties under a written instrument or with respect to property and requests that the rights and duties of the parties be adjudged by the court.'" (*Market Lofts Community Assn. v. 9th Street Market Lofts, LLC* (2014) 222 Cal.App.4th 924, 931.) "'Declaratory relief operates prospectively, serving to set controversies at rest. If there is a controversy which calls for a declaration of rights, it is no objection that past wrongs are also to be redressed; but there is no basis for declaratory relief where only past wrongs are involved.'" (*Baldwin v. Marina City Properties, Inc.* (1978) 79 Cal.App.3d 393, 407; accord, *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1403.) The remedy of declaratory relief is unavailable where a "plaintiff has a fully matured cause of action for money, if any cause exists at all." (*Jackson v. Teachers Ins. Co.* (1973) 30 Cal.App.3d 341, 344; accord, *Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan* (2007) 150 Cal.App.4th 1487, 1497 ["Where, as here, a party has a fully matured cause of action for money, the party must seek the remedy of damages, and not pursue a declaratory relief claim."].)

The second amended complaint alleged the Petrosian defendants, aided by the Wells Fargo defendants, embezzled money from the Corporation's accounts from 2018, when the accounts were opened, through March 31, 2020, when the parties terminated their relationship. The Williams plaintiffs seek as damages from Wells Fargo the value of the stolen funds, but they also allege in their cause of action for declaratory relief that the "actual controversy" is that the Wells Fargo defendants "should be liable for the Plaintiffs['] losses of about $11.5 million." Because the second amended complaint does not seek a

32

declaration of rights to prevent a future breach, the trial court properly sustained the demurrer to the declaratory relief cause of action.

D. *The Trial Court Shall Allow the Williams Plaintiffs Leave To Amend the Causes of Action for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing if the Williams Plaintiffs Can Make a Good Faith Showing They Can Plead a Viable Claim for Breach of an Oral Contract*

An order sustaining a demurrer without leave to amend constitutes an abuse of discretion if "'there is a reasonable possibility that the defect can be cured by amendment.'" (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100; accord, *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865; *Ko v. Maxim Healthcare Services, Inc., supra*, 58 Cal.App.5th at p. 1150.) "The question whether the trial court 'abused its discretion' in denying leave to amend 'is open on appeal even though no request to amend such pleading was made.'" (*Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1132, quoting Code Civ. Proc., § 472c, subd. (a).) "'The plaintiff has the burden of proving that [an] amendment would cure the legal defect, and may [even] meet this burden [for the first time] on appeal.'" (*Sierra Palms*, at p. 1132; accord, *Ko,* at p. 1150; see *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971.)

As discussed, the trial court properly sustained the demurrer to the breach of contract cause of action because the "signature card" attached to the complaint and alleged to be the parties' contract on its face was not a contract. Although the

33

second amended complaint further alleged that "[Tonoyan] made [Williams] execute some documents, which [Tonoyan] stated were necessary to open the accounts," the Williams plaintiffs did not allege the substantive terms or legal effect of the parties' agreement, as required to state a claim for breach of contract. (*McKell v. Washington Mutual, Inc., supra*, 142 Cal.App.4th at p. 1489.)

At oral argument, the Williams plaintiffs' attorney posited for the first time that the breach of contract cause of action is based instead on an oral agreement between Williams and Tonoyan governing the parties' depository relationship. Because such an agreement is not necessarily inconsistent with the allegations in the second amended complaint that Williams signed unspecified documents and instructed Tonoyan that the Petrosian defendants should have only limited check-writing authority, the Williams plaintiffs should have an opportunity on remand to allege breach of an oral contract if they have a good faith basis on which to do so.[15] To the extent they can allege a cause of action for breach of contract, they may also assert a derivative cause of action for breach of the implied covenant of good faith and fair dealing.

---

[15] As noted, it seems improbable the Wells Fargo defendants entered into an oral agreement with Williams that created a limited scope of check authorization for the Petrosian defendants. To the extent the parties entered into a written agreement expressly authorizing the Petrosian defendants to make withdrawals from the Corporation's accounts, any oral limitation of that written authorization cannot overcome Wells Fargo's entitlement under section 1451 to assume all withdrawals are authorized "in the absence of written notice otherwise."

34

## DISPOSITION

The order of dismissal is reversed.  The matter is remanded to the trial court with directions to vacate the order sustaining the demurrer to the second amended complaint without leave to amend and to enter a new order sustaining the demurrer without leave to amend as to the second cause of action for declaratory relief, the fourth cause of action for negligence, and the sixth cause of action for financial elder abuse, and overruling the demurrer as to the third cause of action for conspiracy to embezzle funds and the seventh cause of action for violation of the UCL.  The order is affirmed to the extent it sustains the demurrer to the first cause of action for breach of contract and the fifth cause of action for breach of the implied covenant of good faith and fair dealing, but on remand the trial court is to allow the Williams plaintiffs to file a motion for leave to amend these causes of action.  The order sustaining without leave to amend the Wells Fargo defendants' demurrer to the first amended complaint as to the cause of action for breach of fiduciary duty is also affirmed.  The parties are to bear their own costs on appeal.


                    FEUER, J.

We concur:


PERLUSS, P. J.          SEGAL, J.

35